We'll hear argument now in the case of Cieszynski v. Kijakazi. Mr. Duncan. May it please the Court. Good morning, Your Honors. Dana Duncan on behalf of Lora Cieszynski. The issue before this Court is at its root a fundamental problem in Social Security jurisprudence. It's again a situation where the ALJ claims to know more ultimately about medicine than the medical experts. At the root of this is the fact that the ALJ discounted the opinion of Dr. Boyd, a pain management specialist, who repeatedly said in his evaluation and his medical opinion that he was relying upon a cervical MRI, which noted moderate to severe findings, and a lumbar spine MRI, both of those completed after the state agency's last assessment. So both state agency assessments that the ALJ gave significant weight to never reviewed these MRI results. And ultimately, if you just look, and this is under the old rule, so it's a treating physician rule, which is controlling weight and then the regulatory factors taken into account. If you just look at the weight of the regulatory factors, he had more than two years of treatment with Dr. Boyd. He was a pain specialist. His opinion was repeatedly referred to as being supportive by the cervical and lumbar MRI results. The medical findings, and all you need to do is review Exhibit 12 of the record, and you'll see the multiple findings that were made by him. Everything noted were either him or his nurse practitioner working under his direction noted pain, loss of range of motion, neuropathy in the arms and hands, in the legs. It's consistent with the opinion of the consultative examiner who Social Security had hired to review, who said she could not stand for prolonged periods, which easily could be interpreted as being more than six hours. Now, it's important to remember in this particular case that the claimant was almost 50 years of age at the onset. She fell within that prophylactic period where the grid rules are not mechanically applied. So technically, she would have been 50. She was precluded from past work because it was semi-skilled in nature, and she had depression and other mental impairments that limited her to unskilled work. So therefore, no past relevant work. If we just merely decline the RFC, residual functional capacity, from light to sedentary, she would have met the rules. How important, Mr. Duncan, is, you point out in your brief that there's some confusion on the ALJ's part about the number of chiropractic treatments that you had. Correct. There's no chiropractic records in the file. And it's used in the plural in the ALJs. Yes. There is reference to her having chiropractic evaluations or treatment for headaches, which her testimony indicated were not helpful in the long run. An ALJ in these proceedings has a duty to develop the record. If he was really going to rely on those chiropractic records, he should have indicated that either he was going to have his staff order those chiropractic records or was going to require counsel at the hearing to order those records. Instead, we have very unclear medical information. That is one of the three reasons he gave for discounting the treating source, the other two being the improvement with medication. But Dr. Boyd clearly indicated that the restrictions were granted in conjunction with and in consideration of his or that improvement with medication. He also pointed to the steroid injections. But a review of the record, and I can go point by point if you'd like, shows that she had a few hours of improvement. The improvement sometimes was only 30 percent improvement. It didn't last. She was back where she was before, complaining about pain on a good day six out of ten, on a bad day ten out of ten. And so the three reasons he gave just simply fall. Is there anything in the record suggesting that Dr. Boyd or any of the other doctors who saw her recommended additional treatment? No, and I don't know why. We'd be speculating, okay? Maybe the claimant knows. But Social Security Ruling 16-3P directs that if there is an absence of treatment before it can be used adversely by an ALJ, the ALJ has a duty to make inquiry. He should have asked her why she didn't have surgery. It could have been a multiple of two reasons. It could have been that it was not going to be successful. It could have been that they hadn't. But here it seems to be more than an absence of treatment, that there's also an absence of a recommendation for additional treatment. Correct. And I don't know what the answer to that is, Your Honor. And it's unfortunately speculative on anybody's part as to know why. I don't have any information regarding it. I don't know if it's insurance considerations. There's all kinds of different things that could have even been into play here. But I just don't know. And there's nothing in the record to indicate it was, it wasn't, it was contemplated, anything. So, Mr. Duncan, let me ask you to comment briefly on the concern that the ALJ expresses at page 7 of the opinion about drug-seeking behavior and painkiller searching. Well, she continued to get medications up until then. Unfortunately, I mean, as she noted, she had some improvement with medications. There was no questions. The hydrocodone in particular. I mean, she seems to be herself convinced that she needs the opioids. And she says, if you can't give that to me, I'm not going to be here. Where's that effect? And unfortunately, the problem that comes into play in this day and age is that doctors are no longer prescribing them. So what help she was getting, she's not getting now because she can't get them. I don't know. Implicit in what you just said is that there is a legitimate role sometimes for these kinds of drugs to play. Correct. I mean, just simple fact is that she reported that she had an improvement and was able to undertake certain daily activities that's repeated all through 2014-15 and ended 2016 while she was taking those opioids. When they stopped, I'm sure her condition deteriorated, which would probably make anyone angry. But yet again, the judge had a duty to inquire about that and ask her about that. Because we don't know, and it calls for speculation as to what the answer is. If there are no questions, I'll reserve my last two minutes. Certainly, Mr. Duncan. Mr. Yarnell. Your Honors, may it please the Court, my name is Eric Yarnell. On behalf of the Acting Commissioner of Social Security, we ask this Court to affirm the LJ's decision because it was reasonable and supported by substantial evidence. I did want to say right off the bat that the ALJ did find the claimant severely limited by her various conditions, including her back impairment. He indicated that she required limitations to light work. He imposed a variety of postural limitations. And he agreed that she could no longer do her past work. But after going through the five-step process in these disability cases, those restrictions did not justify finding disability. So, Mr. Yarnell, I've tried to read this several times. The ALJ's residual functional capacity description, frankly, sounds weird to me in light of the record that we have. I'm looking at the bold-faced part on page five of the opinion. She has the RFC to perform light work as defined in the regulation, except she is limited to frequent climbing of ladders, ropes, or scaffolds, frequent climbing of ramps or stairs, and frequent balancing, kneeling, crouching, or crawling. I'm trying to imagine this woman frequently climbing up ladders, ropes, or scaffolds. She's limited to occasional stooping. Maybe that makes some sense. She's limited to frequent interactions with supervisors. It's just the first part of this RFC does not seem to bear any relation to the evidence in the record. Well, to some extent, the ALJ was relying on the expert opinion. The frequent climbing of ladders, ropes, or scaffolds, frequent climbing of ramps or stairs, and frequent balancing, kneeling, crouching, or crawling? What evidence in the record supports that? So the state agency expert who opined essentially an almost identical residual functional capacity assessment was informed primarily by the consultative examination objective findings, which were done in January 2014. So during that appointment, the claimant exhibited... So she can get up onto the examining table, fine. I don't know that that takes you to frequency of all these things. I won't repeat it again. And that seems at odds with the consultative physical opinion that was the state agency employed. Dr. Linford, who said she would not tolerate prolonged sitting, standing, lifting heavy loads repeatedly, he was pretty limited on what she could do. He was, Your Honor. And that was one of the reasons why the ALJ, when weighing his opinion, found it was essentially the underlying opinion was inconsistent with his own exam findings. And the ALJ also found it vague that were prolonged. But give us the best case for that, because really the exam findings, he makes conclusions. He's a professional, right? He makes conclusions after he's examined her. And for the ALJ, or for that matter, even the people who read the record, to override that, especially in the face of the later MRIs, yields some conflict in this record. I think the ALJ was also informed by other evidence beside the state agency, and in fact evidence that came after even the MRI scans. Such as? The claimant's improvement on certain treatment. But see, the improvement finding, I'm reminded of the first remand here, the improvement finding doesn't seem to acknowledge that this was very limited in time, sometimes a matter of hours, sometimes maybe a matter of weeks. That's a big difference, because the ability to perform full-time work isn't measured a week at a time. The Social Security Administration doesn't say somebody can work if that's all it is. You've got to be able to hold down a 40-hour a week, roughly, job over years. Yes, Your Honor. The ALJ did acknowledge that it was only some improvement, that it was not a complete recovery. But some is too vague a word, isn't it? Certainly in certain circumstances it would be, Your Honor. It strikes me as pretty vague here, because if some means for two weeks she feels a little more comfortable moving around and the pain is down to like a 5 out of 10 instead of a 9 out of 10, but then it pops back up again to between 7 and 10, that's not enough of an improvement to change your employment prospects. Well, I think the other kind of facet of the treatment issue for the ALJ, which the ALJ noted numerous times in the decision, was the lack of back treatment after June 27. And why didn't she do that? I mean, as Mr. Duncan said, some people conclude that they've plateaued, that there's only so much that's going to happen. Some people don't have insurance or the financial wherewithal to see physicians or nurse practitioners, whoever you can manage to see, because they can't afford it. I mean, do we know, do we have any idea why she isn't being treated? Well, the ALJ did ask about the claimant's insurance coverage during the hearing, and she indicated that she was insured, I believe, after 2015 with public health insurance in Wisconsin. And so the subject was brought up during the hearing. But the ALJ didn't inquire as to whether or not any of her physicians or any consulting physicians were recommending treatment that would give her relief. It was not explored. At all. Not that I saw. If I'm missing it, please tell me. I mean, admittedly, the ALJ was vague at certain points in the decision. Vague is generous. I mean, the other thing that I'd like to actually correct, something that Mr. Duncan said, was he characterized Dr. Boyd, who's the treating doctor who did issue the opinion in her favor in this case, he characterized him as a pain management specialist. No, he was a family practice doctor, but he was, as many do, he was her primary physician. So that entitles him to the treating physician presumption from back in the day when we had that. But he did refer her elsewhere. He referred her to him. He was managing her pain, although he was not somebody in a clinic. I guess she actually also saw somebody else. I'm not sure that matters, but you can certainly correct that. I'm troubled by the MRI scans here. And Dr. Boyd is the only medical professional that viewed them and gave an opinion on them. And the ALJ seems to give his own opinion without any medical expertise. How do you respond to that? So it's definitely the case that Dr. Boyd is the only doctor who gave an opinion characterizing that MRI. But the ALJ did review evidence that still put that MRI in context. And this court held, I believe, in Durham recently that an ALJ can't evaluate even a complicated medical record if other evidence provides context. And in this case, that June 2016 pain management appointment, this was the one where her pain management provider essentially cut her off from hydrocodone, and after which she didn't receive treatment. So during that appointment, right on the treating record, it says MRI scan, moderate to severe findings, right next to a series of examination findings. But where does the ALJ grapple with that moderate to severe? Because what the administration, for very good reasons, is usually looking for, if you can find it, is some objective test or indicator that would explain why somebody is experiencing the physical symptoms they are, in this instance the pain. And certainly this kind of severe result in both the cervical and the lumbar spine could lead people to be in tremendous pain. It does. I think the ALJ was focusing on the relatively unremarkable examination findings in the record. So that's just saying, well, I'm going to ignore all the things that explain why she might be in pain, and I'm going to focus on the fact that she can get up on the examination table. And how is that consistent with Dr. Boyd relying on these MRI scans, and then the record that you pointed out saying that there were severe findings? That's what concerns me, that you have these two. The only thing we know about the MRI is Dr. Boyd's reliance on it and his ultimate opinions, and then the finding that they were moderate and severe findings in there. And the ALJ doesn't, other than citing that, explain how that impacts his disregard of Dr. Boyd. That's what troubles me. Well, I do think there's also, just looking at the record, there's also no indication, because the ALJ did rely on those state agency experts. But they hadn't seen the MRIs. But there's also no indication in the record that there was a substantial deterioration or even a change in the condition from when the state agency reviewed it in early 2014 and then a few months later when the MRI. But there were no prior MRIs. I mean, if there were some prior MRI and it looked exactly the same as the later ones, then maybe the state agency people had everything they needed to have. But this was the first one, or the couple. It was, Your Honor. And we ask the Court to affirm the ALJ. Thank you, Counsel. Anything further, Mr. Duncan? Just briefly, Your Honor. Mr. Yarnell pointed out something that was key here that I wanted to stress. It's reliance on the state agency doctors who said light. Definition of light is standing up to six hours a day, lifting occasionally. It's up to a third of the day, 20 pounds. And we have a woman here who throughout this entire period, six out of ten pain, positive joint pain, neck pain, mid-back pain, low-back pain, loss of range of motion, tenderness, numbness in her lower extremities and her upper extremities. What we have in actuality is nothing more than the ALJ saying that I'm going to discount Dr. Boyd because I don't think that MRI says that she's as bad as he claims. That's ultimately the problem. And this Court has said in Aiken, Goins, Lambert, Moreno, McHenry, Stig, Keyes, Olson, and Camplin that that's just not appropriate. And that's where we are. So, on that, I thank you for the opportunity to present my case. Thank you, Counsel. The case is taken under advisement.